# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs September 10, 2015

## STATE OF TENNESSEE v. AURELIO GARCIA SANCHEZ

**Appeal from the Criminal Court for Macon County**
**No. 2012-CR-13          David Earl Durham, Judge**

---

### No. M2014-01997-CCA-R3-CD – Filed December 4, 2015

---

A Macon County jury convicted the Defendant, Aurelio Garcia Sanchez, of five counts of rape of a child. The trial court sentenced the Defendant to serve consecutive twenty-five year sentences for each conviction, for an effective sentence of 125 years in the Tennessee Department of Correction. On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress his statement to police; (2) the evidence is insufficient to sustain his convictions; and (3) the trial court erred when it imposed consecutive sentences. After a thorough review of the record and applicable authorities, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., filed a separate concurring opinion, and ROBERT L. HOLLOWAY, JR., J., filed a separate concurring opinion.

Comer L. Donnell, District Public Defender, Joe McLerran and Thomas H. Bilbrey, Assistant District Public Defenders, for the appellant, Aurelio Garcia Sanchez

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Tom P. Thompson, Jr., District Attorney General; and Justin G. Harris, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from allegations of sexual abuse made against the Defendant by

the victim, B.S.[1], the Defendant's stepdaughter. A Macon County grand jury indicted the Defendant for five counts of rape of a child and five counts of aggravated sexual battery. The five counts of aggravated sexual battery were dismissed before trial.

## A. Pre-Trial Proceedings

On August 23, 2011, the Defendant was interviewed at the Macon County Sheriff's office. Sheriff's deputies participated in the interview, along with an officer from the Gallatin Police Department and a representative from the Department of Children's Services ("DCS"). The Defendant filed a motion to suppress his statements made during the interview. At the suppression hearing, the following evidence was presented: Bill Cothron testified that he was a lieutenant with the sheriff's office and that he assisted with the Defendant's interview. He recalled that present at the interview were Terry Tuck, another sheriff's deputy, Carolyn Stoops from DCS, the Defendant, and Sherry Knight, who was B.S.'s mother and also the Defendant's wife. Lieutenant Cothron testified that the Defendant and Ms. Knight were "called in" to the sheriff's office on their way to dinner to "talk about some allegations with a child."

Lieutenant Cothron testified that the Defendant was brought into the interview room and Lieutenant Cothron then began talking with the Defendant, in an attempt to establish a rapport and to find out if the Defendant could speak English. The lieutenant said that, once he determined that the Defendant could speak English, he "read him his rights." Lieutenant Cothron testified that he determined that the Defendant could speak English "through conversation." Lieutenant Cothron recalled that he specifically asked the Defendant if he could speak English, and the Defendant replied, "Yes." Lieutenant Cothron testified that, after he read the *Miranda* rights to the Defendant, he had the Defendant sign a waiver form. Lieutenant Cothron testified that he did not know what happened to the form and that it was no longer in his file. He believed that the Defendant fully understood his rights. Lieutenant Cothron and the Defendant carried on a conversation, using "complex sentences" about where the Defendant lived and for how long, where he worked, and the nature of his relationship with B.S.

Lieutenant Cothron reiterated that, after he read the Defendant his *Miranda* rights, the Defendant waived his rights by signing the form, and the Defendant agreed to speak with him. Chief Terry Tuck and Ms. Stoops were present when the Defendant signed the waiver. He agreed that the interview took place in an unsecure area of the sheriff's office and that a person could simply walk out of the interview room. Lieutenant Cothron told the Defendant he was not under arrest, and the Defendant acknowledged that he understood.

---

[1] It is policy of this Court to refer to minor victims and victims of sex crimes by their initials only.

On cross-examination, Lieutenant Cothron stated that the interview took place at around 5 p.m. He stated that he did not ask the Defendant whether he spoke or read Spanish and did not ask him whether he needed an interpreter. Lieutenant Cothron testified that he did not do those things because, based on the Defendant's ability to converse in English, he did not think it was necessary. He stated that the sheriff's office had waiver forms written in Spanish, and that one was available that day, but that the Defendant was not offered one.

Lieutenant Cothron testified that he started the interview by building a rapport with the Defendant, who initially denied having sexual contact with B.S. Lieutenant Cothron testified that his involvement in the interview lasted thirty to forty minutes until Lieutenant Cothron had to leave to work on another case. Lieutenant Cothron did not know whether the interview continued after he left. Lieutenant Cothron recalled that he asked the Defendant if he would be willing to take a lie detector test and the Defendant said, "Yes."

Carolyn Stoops testified that she was present in the interview room with Chief Tuck and Lieutenant Cothron and remained in the room until the end of the interview. Ms. Stoops testified that she observed and took notes throughout the interview. She testified that the Defendant said he understood his rights, and she recalled that he spoke English. Her observation was that the Defendant understood all the questions, and he answered them appropriately.

On cross-examination, Ms. Stoops stated that the Defendant never asked for an interpreter or an attorney during his interview. Ms. Stoops clarified that the Defendant came to the office for the interview after Ms. Stoops called Ms. Knight, who was with the Defendant at the time, and asked them to come to the office.

Sergeant Pete Ritchie testified that he worked as an investigator for the Gallatin Police Department and performed a lie detector test on the Defendant. The Defendant told Sergeant Ritchie that he had been advised of his *Miranda* rights and that he agreed to take the lie detector test. Sergeant Ritchie offered to perform the lie detector test through an interpreter, but the Defendant declined. During the lie detector test, the Defendant never gave the impression that he did not understand the questions or was confused by the questions being asked in English. After the lie detector test was completed, Sergeant Ritchie showed the results to Chief Tuck, and together they interviewed the Defendant a second time.

During the second portion of the Defendant's interview, Chief Tuck told the Defendant that his lie detector test results indicated that he had been dishonest. He

advised the Defendant of his *Miranda* rights, and the Defendant signed another waiver form. Chief Tuck then asked the Defendant questions about whether he had touched B.S inappropriately. Sergeant Ritchie recalled that the Defendant was forthcoming in his response to Chief Tuck's questions, corroborating B.S.'s statements about where the touching occurred, and admitted to performing oral sex on B.S. The Defendant was remorseful and explained to Chief Tuck and Sergeant Ritchie that he had been victimized sexually as a child by his cousin.

During the interview, Sergeant Ritchie offered to get the Defendant food and drink and then left the Defendant and Chief Tuck alone while he went to McDonald's to get food for the Defendant. At the time he left, Chief Tuck had begun writing out a statement, and it was completed when Sergeant Ritchie returned to the interview room. Chief Tuck informed Sergeant Ritchie that the Defendant had admitted to a total of five sexual encounters with B.S. Chief Tuck read the written statement to the Defendant and then let the Defendant read it himself. Sergeant Ritchie witnessed the Defendant sign the statement, and then Sergeant Ritchie signed his own name as a witness. The statement was admitted as evidence into the record.

On cross-examination, Sergeant Ritchie testified the Defendant initially denied touching B.S. He recalled being absent from the interview room to get food for the Defendant for approximately twenty minutes. During his absence, the Defendant admitted to several incidents with B.S. The Defendant had admitted to performing oral sex on B.S. before Sergeant Ritchie left the room.

Terry Tuck testified that he worked as a deputy for the Macon County Sheriff's office at the time of the Defendant's interview but had since become Chief of Police for the Red Boiling Springs Police Department. Chief Tuck identified his own handwriting and the Defendant's signature at the bottom of the Defendant's statement. He testified that, throughout his questioning of the Defendant, the Defendant seemed to understand and appropriately respond to his questions. Chief Tuck did not have any concern that the Defendant did not understand him and thus never saw a need for an interpreter. He denied that he or anyone else present during the interview yelled at or threatened the Defendant. He stated that he wrote out the Defendant's statement based on what the Defendant had told Chief Tuck and then provided the Defendant with a copy to review.

On cross-examination, Chief Tuck clarified that the lie detector test was administered between two portions of the interview. He clarified that the Defendant gave his statement beginning at 9:16 p.m., after arriving at the sheriff's office around 4:30 p.m., and officers arrested the Defendant at approximately 11:00 p.m.

Sherry Knight, the Defendant's wife and B.S.'s mother, testified that she did not

4

speak Spanish and that she and the Defendant spoke only English to each other.

Through an interpreter, the Defendant testified that he was born in Mexico and moved to the United States when he was sixteen years old. He testified that he finished high school in Mexico and could read and write in Spanish. He stated that he could read and write in English but "not completely." The Defendant testified that he never attended school in the United States.

The Defendant testified that Lieutenant Cothron threatened him during the interview and did not advise him of his *Miranda* rights. The Defendant was shown the waiver form from the second portion of the interview, and he denied that his signature was on it. He testified that Chief Tuck never told him he had a right to a lawyer or an interpreter. He testified that his English was limited and not very good. The Defendant testified that he needed an interpreter during the interview but did not feel that he could ask for one. He denied ever telling interviewers or his wife that he had touched B.S. The Defendant testified that, during a telephone conversation with his wife following his arrest, he told her that he was sorry for their situation but denied that he ever talked about him touching B.S. He testified that he never admitted to "licking" B.S.

The Defendant testified that his interview lasted approximately six hours. He testified that he denied the interviewers' accusations but that, after many hours of questioning, he thought Lieutenant Cothron was going to hit him, and he "felt lost." Chief Tuck also threatened him and spoke aggressively during the interview. The Defendant testified that he had never met Sergeant Ritchie or been questioned by him.

At the conclusion of the hearing, the trial court denied the Defendant's motion to suppress. The trial court found that the Defendant was in custody at the time he was being interviewed. The trial court further found that the Defendant was advised of his rights multiple times, by Lieutenant Cothron, Sergeant Ritchie, and Chief Tuck. Addressing the question of whether the Defendant understood his rights and whether his waiver was voluntarily, the trial court made the following statement:

> [T]his Court has listened to five different witnesses [who] testified under oath that this Defendant speaks, understands and knows English, including his wife who has lived here with him, married for three years, had his children. The Defendant himself testified that he has lived [in the United States] since he was sixteen and a half years old.
>
> He has been in Macon County since 1997. The Defendant's testimony has been diametrically opposed to the statements of five

5

witnesses that testified as to his knowing and understanding of the English language and his ability to understand his *Miranda* rights.

This Defendant has zero credibility as to his testimony. This Court finds that his testimony is totally untruthful. So, the credibility weighs in favor of the State of Tennessee. This Court does find that this Defendant did understand his rights, did knowingly waive his rights, and did give a voluntary statement, not only to the Macon County Sheriff's Department, but also to Ms. Sherry Knight, his wife.

## B. Trial

At the Defendant's trial, the following evidence was presented: B.S. testified that she was fourteen-and-a-half years old at the time of trial and in the ninth grade. She stated that Sherry Knight was her mother and that she had one brother and six step-brothers. Her brother, G.A.S., was three years old at the time of trial, born in December 2010. B.S. recalled that, after he was born, she lived with Ms. Knight, the Defendant, and her brother. Ms. Knight was recovering from the birth of G.A.S. at the time, but Ms. Knight resumed working in early 2011. The Defendant, who had been living with B.S. and Ms. Knight for two or three years, stayed home with B.S. while Ms. Knight went to work.

B.S. testified that, while her mother was at work, the Defendant touched her thighs and "messed with" her, causing her to feel uncomfortable. She testified that the Defendant took her clothes off and touched her vagina with his fingers and his tongue. He also touched her breasts with his tongue. She stated that this happened "a lot," estimating over twenty times.

B.S. testified that, on one occasion, in the living room of their residence, the Defendant touched her legs, took off her clothes, put his tongue on her vagina and "spread my vagina apart" with his fingers. B.S. testified that this happened "over thirty" times in the living room. She testified that, on one occasion in her mother's room, the Defendant took her clothes off and put his tongue on her vagina. The Defendant kept his clothes on. On another occasion in her mother's room, the Defendant took off his clothes except for his boxer shorts. Again, the Defendant took off B.S.'s clothes and put his tongue on her vagina. He also used his fingers to spread apart her vagina. B.S. recounted that these events happened in her bedroom "about twice" and in the living room and her mother's room "a lot." She estimated that it happened over thirty times in the living room and over thirty times in the bedroom. B.S. testified that on one occasion in the living room, the Defendant kissed her, took her clothes off and put his tongue on her vagina.

6

B.S. testified that after each incident she would wash herself with a rag in the bathroom. She stated that the Defendant would "spy" on her in the bathroom, so she began locking the door. The Defendant told B.S. that he loved her more than her mom.

B.S. testified that she did not speak Spanish and only spoke English with the Defendant, and he never had difficulty understanding her.

On cross-examination, B.S. testified that the Defendant, while living with her and her mother, asked her to clean the house, do dishes, and encouraged her to do her homework. She agreed that she and the Defendant had arguments when she did not clean the house before he came home. B.S. stated that she told a friend about the Defendant touching her in August 2011. She said she wanted to tell someone because it did not feel right to her.

Sherry Knight, B.S.'s mother, testified that she was married to the Defendant and had a son with him. She testified that the Defendant lived with her for four or five years. She recalled accompanying the Defendant to his interview when he spoke to Sheriff's deputies. After that interview, Ms. Knight did not return to her home, and she spoke to the Defendant by telephone three days later. During their phone conversation, the Defendant admitted that he "touched" and "licked" B.S. but denied having had sex with B.S.. Ms. Knight stated that the Defendant was thirty-five years old at the time.

Ms. Knight testified that while packing up the Defendant's belongings she found, inside a pocket of his coat in a laundry basket, his underwear and B.S.'s underwear "tied together." She reported her finding to Chief Tuck.

On cross-examination, Ms. Knight agreed that she was still married to the Defendant and had known him for at least four years before they got married. She stated that B.S. and the Defendant got along "all right" and she agreed that he encouraged B.S. to do her homework and her chores. She agreed that B.S. and the Defendant sometimes had disagreements but stated that she had never seen the Defendant act inappropriately toward B.S.

Ms. Knight testified that she talked with the Defendant on the phone three days after his arrest. He called her from jail and told her that he had touched and licked B.S. but again denied having sex with her. Ms. Knight agreed that she did not tell investigators about this phone call until the week before trial. Ms. Knight agreed that she did not know how B.S.'s underwear got into the laundry basket and she was making an assumption that the Defendant was involved.

7

Chief Terry Tuck testified that he worked for the Macon County Sheriff's office and that he, Lieutenant Cothron, and Ms. Stoops interviewed the Defendant, assisted by Sergeant Ritchie, and that the initial interview lasted approximately forty-five minutes. Chief Tuck said that he spoke English with the Defendant and never considered getting an interpreter because the Defendant appeared to understand the questions and responded appropriately. The Defendant told Chief Tuck he had been molested as a young boy by a cousin or uncle. The Defendant admitted having sexual contact with B.S.

Chief Tuck wrote out the Defendant's statement and the Defendant signed it at the bottom of the statement. Chief Tuck read the Defendant's statement aloud for the jury:

> About two months ago I was at home with my kids. My wife left for work about 9:45 p.m. . . . A lot of times I would already be asleep and I would wake up during the night and [B.S.], my step daughter, would be up watching television. [B.S.] was supposed to be in bed, and when I would get up, I would catch her watching television. I told her she was supposed to be in bed, and she would come up close to me trying to sweet talk me into letting her stay up. There were about five occasions that this happened, and I let myself get carried away with [B.S.]. I would stroke her hair. And on these five occasions I pulled her pajama bottoms down and would lick her vaginal area. I'm sorry that this happened and I let myself go too far with [B.S.]. Ever since this started, this has been bothering me and I'm glad it's over and I'm sorry that this happened.

Chief Tuck recalled that when the Defendant started to give his statement, Lieutenant Cothron was present and then was called away so Sergeant Ritchie joined the interview in his place.

On cross-examination, Chief Tuck agreed that the written statement was not the Defendant's "exact words" from the interview. He recalled that, about an hour into the interview, Sergeant Ritchie asked the Defendant if he was hungry and left the interview to get food for the Defendant. Chief Tuck denied that anyone present in the interview room yelled at or touched the Defendant. He agreed that the Defendant initially denied any sexual contact with B.S. Chief Tuck told the Defendant repeatedly that he was not telling the truth. He agreed that there was no recording of the interview, although the technology to do so was available. He also recalled that he had a discussion with Lieutenant Cothron about recording the interview.

Sergeant Pete Ritchie testified that he worked for the Gallatin Police Department and assisted Chief Tuck in the investigation of this case. Sergeant Ritchie recalled that he was present in the interview room with Chief Tuck when the Defendant admitted to

8

having sexual contact with B.S. He was also present when the Defendant was advised of his *Miranda* rights, and Sergeant Ritchie advised the Defendant as well. Sergeant Ritchie described the tone of the interview as professional and respectful and testified that the Defendant was treated fairly. Sergeant Ritchie identified the waiver of rights form signed by the Defendant, which Sergeant Ritchie witnessed.

The Defendant testified that he was born in Mexico and lived there until he was sixteen years old. He had "not much, very little" understanding of English when he came to the United States. The Defendant testified that he first moved to Kentucky where he worked in tobacco farming for three months. He then moved to Murfreesboro, Tennessee to live with his father and his father's wife. The Defendant met and was married to his first wife in Murfreesboro for three years, and then they divorced. He moved to Carthage, Tennessee where he met and married his second wife. They were married for eight years and then divorced, after which he met and married his third wife, Sherry Knight. At the time they married, the Defendant was working as a bricklayer. The Defendant and Ms. Knight lived together with Ms. Knight's daughter, B.S. He testified that his relationship with B.S. was "good" at first, but later they started to fight and argued frequently about her schooling and homework. The Defendant recalled that things got worse between B.S. and him after he and Ms. Knight had a son together.

The Defendant testified that he did not do any of the sexual things that B.S. claimed that he had done. He denied touching her vagina with his fingers or his mouth and said that B.S.'s accusations were made out of "hate." The Defendant recounted that, shortly before B.S. made her accusation against him in 2011, the two had fought about her joining the cheerleading squad and her wanting a boyfriend.

The Defendant recalled his interview at the sheriff's office. Investigators, he said, never offered to contact an interpreter or discussed his understanding of the English language with him. The Defendant testified that he was never read his *Miranda* rights. The Defendant testified that he had difficulty understanding the investigators' questions and that he never signed anything. The Defendant testified that he felt threatened by the investigators and that Lieutenant Cothron got angry with him and lunged at him. The Defendant testified that when this occurred he began crying. The Defendant denied that Sergeant Ritchie questioned him. The Defendant testified that the investigators misinterpreted his statement that he had been abused five times by his cousin and incorrectly believed that he had abused B.S. five times. The Defendant denied that it was his signature on the statement and waiver of rights form.

On cross-examination, the Defendant testified that he did not learn of B.S.'s allegations until the day after he was interviewed. He said that B.S, his wife, and law enforcement were all fabricating their statements against him to "make a perfect crime."

9

Based upon this evidence, the jury convicted the Defendant of five counts of rape of a child.

## C. Sentencing

At the Defendant's sentencing hearing, the trial court admitted the presentence report into evidence, which included a victim impact statement wherein B.S. reported she had undergone nine months of counseling as a result of the Defendant's actions. The trial court imposed a sentence of twenty-five years for each of the five counts, to be served at 100%. The trial court found that no mitigating factors applied in this case, and applied two enhancement factors: enhancement factor (7), that the offense involved a victim and was committed to gratify the Defendant's desire for pleasure or excitement; and enhancement factor (14), that the Defendant had abused a position of private trust. *See* T.C.A. § 40-35-114 (7), (14) (2014). The trial court stated that the Defendant had used his position as the victim's stepfather in order to abuse her.

The trial court then considered consecutive sentencing, and stated that consecutive sentencing was proper in the case of a "horrendous" crime against a child. The trial court applied factor (b)(5), that the Defendant was convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the Defendant and victim, the time span of the Defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim. T.C.A. § 40-35-115 (b)(5) (2014). The trial court found that all three factors listed in (b)(5) were present: the abuse had occurred over a long period of time, the Defendant's relationship to the victim as her stepfather, and the mental damage to the victim. The trial court ordered all five sentences to be served consecutively, thus imposing a total effective sentence of 125 years. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that: (1) the trial court erred when it denied his motion to suppress his statement to police; (2) the evidence is insufficient to sustain his convictions and that, the jury's verdict is inconsistent with the law and contrary to the weight of the evidence; and (3) the trial court erred when it imposed consecutive sentences.

## A. Suppression

The Defendant contends that his statement made during his interview should have

been suppressed because the investigators knew that his first language was not English and did not provide him an interpreter or any forms written in Spanish. The Defendant contends that the evidence shows that he was confused during the interview and did not understand his rights, and thus, based on the totality of the circumstances, did not knowingly and intelligently waive his rights. The State responds that the trial court properly concluded that his statement was voluntary based on the testimony of multiple police officers and the Defendant's wife. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Tennessee Constitution protect an accused's privilege against self-incrimination. Moreover, in *Miranda v. Arizona*, 384 U.S. 436, 478-479 (1966), the United States Supreme Court held that the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination requires police officers, before initiating custodial interrogation, to advise the accused of his right to remain silent and his right to counsel. Assuming the use of these procedural safeguards by police interrogators and provided that the accused is acting voluntarily, knowingly, and intelligently, an accused may waive his Miranda rights. *State v. Mann*, 959 S.W.2d 503, 529 (Tenn. 1997).

In *State v. Stephenson*, 878 S.W.2d 530, 544-545 (Tenn. 1994), our Supreme Court defined a voluntary and knowing waiver of Miranda rights:

> Relinquishment of the right must be voluntary in the sense that it is the product of a free and deliberate choice rather than the product of intimidation, coercion or deception. Moreover, the waiver must be made

with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon. The "totality of the circumstances surrounding the interrogation" must reveal both an uncoerced choice and the required level of comprehension before a court can properly conclude that Miranda rights have been waived.

Language difficulties encountered by a defendant are a factor to be considered in the totality of the circumstances when determining if a waiver is valid. *See State v. Van Tran*, 864 S.W.2d 465, 473 (Tenn. 1993) (citations omitted).

The evidence presented at the hearing does not preponderate against the trial court's finding that the Defendant's statement was given voluntarily and was not the product of coercion. Multiple witnesses, including the Defendant's wife of several years, three investigators and a DCS worker, testified that he spoke English during the interview and had no trouble understanding questions asked in English. The Defendant's wife testified that she did not speak Spanish and only spoke English with the Defendant at home. B.S. testified that she spoke with the Defendant in only English, and the Defendant never had difficulty understanding her. The three investigators, Chief Tuck, Lieutenant Cothron, and Sergeant Ritchie, all testified consistently that they had complex conversations with the Defendant and that at no time did the Defendant demonstrate that he could not participate in the conversation in English. The Defendant "easily" responded to their questions in English. All three investigators and Ms. Stoops said that the Defendant never asked for an interpreter and that he was not offered one because of his apparent ease with conversing in English. Additionally, all three investigators recalled that the Defendant was read his *Miranda* rights multiple times and that he readily acknowledged his understanding of his rights.

The trial court determined that the Defendant was completely untruthful in his testimony that he could not understand what the officers were saying and his testimony that he was never advised of his rights. We reiterate that it is within the province of the trial court to make credibility determinations as to the witnesses who testify. *Odom*, 928 S.W.2d at 23. The evidence does not preponderate against the trial court's finding that the Defendant spoke English and understood his rights and the questions being asked of him. Therefore, we too conclude that the Defendant's statement was voluntarily given. The Defendant is not entitled to relief.

**B. Sufficiency of Evidence**

Next, the Defendant contends that the evidence presented at trial is insufficient to sustain his five convictions for rape of a child because the State failed to prove the element of penetration. He also contends that the victim did not testify about the

12

specific dates when the offenses took place. He further contends that "the verdict of the jury is inconsistent with the law and evidence" and is "contrary to the weight of the evidence," and that, "as a matter of law, there was reasonable doubt" as to his guilt. The State responds that the evidence was that the Defendant licked the victim's vagina was sufficient to prove the penetration element. The State further responds that the election of offenses provided by the State allowed the Defendant sufficient notice to prepare a defense and that it was not required to prove the date of each offense. Finally, the State responds that the jury weighed the evidence and found it to be sufficient to support guilty convictions for five counts of rape of a child. The State contends that the evidence presented at trial was sufficient for a rational juror to conclude beyond a reasonable doubt that the Defendant committed the five acts of rape of a child. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated

the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

A conviction for rape of a child requires "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522 (a) (2014). Tennessee Code Annotated section 39-13-501(6) and (7) defines sexual penetration as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body . . . ." and sexual contact as "the intentional touching of the victim's, the defendant's, or any other person's intimate parts . . . ." There is sexual penetration, in a legal sense, if there is the "slightest penetration" of a female's sexual organ. *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001). This includes the "outer folds" of the vagina. *Id.*

> During closing argument, the State made the following election of offenses: Count 1: "in the living room, . . . [the Defendant] took off [B.S.'s] clothes, spread her vagina with his fingers and he licked her vagina."

> Count 2: "is also in the living room. The same [acts], [the Defendant] removes [B.S.'s] clothes, spreads her vagina and licks her vagina."

> Count 3: "is in her mom's bedroom, [the Defendant's] bedroom. [B.S.] testifies that he removes her clothes . . . spreads her vagina,

14

licks her vagina."

Count 4: "this time [the Defendant is] in his boxers, removes all his other clothes.  [B.S.] testified to that, spread her vagina, licked her vagina."

Count 5: "is the time that he kissed her.  . . .  It was in the living room, removed her clothes, spread her vagina, licked her vagina."

As to the Defendant's argument that the victim never testified about the specific dates when the offenses took place, we agree with the State that its election of offenses provided the Defendant with sufficient notice about the specific sexual acts for which he was prosecuted.  "This Court has consistently held that when the evidence indicates the defendant has committed multiple offenses against a victim, the prosecution must elect the particular offense as charged in the indictment for which the conviction is sought." *State v. Brown*, 992 S.W.2d 389, 391 (Tenn. 1999) (citations omitted).  Because of the difficulty faced by young victims of sexual abuse when testifying, this Court has adopted the policy that "[a]ny description that will identify the prosecuted offense for the jury is sufficient."  *Id.* at 392 (citing *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993)).  In the present case, the victim testified that the offenses occurred around the time her brother was born in December 2010 and during the time when her mother went back to work, following her maternity leave, in the beginning of 2011.  The victim made her accusations against the Defendant in August 2011.

The evidence presented and viewed in the light most favorable to the State was that B.S. was home alone with the Defendant and he took her clothes off in the living room of their residence and touched B.S.'s legs, took off her clothes, put his tongue on her vagina and "spread [her] vagina apart" with his fingers.  He also touched her breasts with his tongue.  B.S. testified that this happened at least thirty times in the living room. She also testified that these same acts, including the Defendant licking her vagina, occurred in her mother's room on multiple occasions.  B.S. testified that on another occasion, the Defendant took off all his clothes except his boxers and took off B.S.'s clothes.  The Defendant put his tongue on B.S.'s vagina and used his fingers to spread apart her vagina.  The Defendant admitted in a telephone conversation with Ms. Knight, B.S.'s mother, that he had licked her vagina and touched her vagina.  The Defendant admitted to law enforcement that these sexual acts occurred five times.  This evidence is sufficient for a jury to conclude that the Defendant sexually penetrated B.S., as legally defined, by penetrating her vagina with his tongue, and thus was guilty of the offense of rape of a child.  Because we have held that the evidence presented was sufficient from which a jury could conclude that the Defendant was guilty of five counts of rape of a child, we hold that the jury's verdict is not contrary to the law and evidence presented at

trial.  The Defendant is not entitled to relief on these issues.

## C. Consecutive Sentencing

The Defendant next contends that the trial court erred when it ordered his sentences to run consecutively.  The State responds that the trial court properly considered the relevant factors and imposed a sentence consistent with the purposes and principles of the Sentencing Act.  We agree with the State.

Tennessee Code Annotated section 40-35-115 (b) provides that a trial court may order sentences to run consecutively if it finds any one of the statutory criteria by a preponderance of the evidence.  As it relates to this case, the trial court found the following criteria applicable:

> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

T.C.A. § 40-35-115 (b)(5)  The imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" T.C.A. § 40-35-103 (2), (4).  In addition to these criteria, "consecutive sentencing is guided by the general sentencing principles providing that the length of a sentence be 'justly deserved in relation to the seriousness of the offense' and 'no greater than that deserved for the offense committed,'" although specific factual findings are not necessary.  *State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002); *see also* T.C.A. §§ 40-35-102(1), -103(2); *In re Sneed*, 302 S.W.3d 825, 828-29 (Tenn. 2010).  We review a trial court's decision to impose consecutive sentences for an abuse of discretion with a presumption of reasonableness.  *State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013).

The record in this case reflects that the trial court considered the appropriate principles of sentencing and that it imposed within-range sentences for each conviction. Our review of the record indicates that the trial court properly applied criteria (5), that the Defendant was convicted of multiple offenses involving the sexual abuse of a minor, and we conclude that consecutive sentencing was proper in light of that factor.  *See State v. Ugenio Ruby-Ruiz*, No. M2013-01999-CCA-R3-CD, 2015 WL 2227933, at *7 (Tenn. Crim. App. May 12, 2015) *No Tenn. R. App. P. 11 filed* (affirming the defendant's one

hundred and twenty-five year sentence upon a finding that the victim, the defendant's stepdaughter, had been abused over a five year period and had suffered mental damage as a result); *State v. William Douglas Zukowski*, No. M2001-02184-CCA-R3-CD, 2003 WL 213785, at *21 (Tenn. Crim. App., Jan. 31, 2003) *perm. app. denied* (Tenn., May 19, 2003) (consecutive sentences proper for five convictions of rape of a child resulting in an effective one-hundred twenty-five year sentence involving a handicapped victim, and the abuse occurred for two years); and *State v. Frank Crittenden*, No. M1998-00485-CCA-R3-CD, 1999 WL 1209517, at *4 (Tenn. Crim. App., Dec. 17, 1999) *perm. app. denied* (Tenn., June 5, 2000) (consecutive sentencing upheld resulting in an effective sentence of one-hundred years where the defendant was indicted on thirty-six counts of sexual abuse and pled guilty to eight counts of aggravated rape of his minor daughter occurring over a period of eight years).   The Defendant is not entitled to relief as to this issue.

### III. Conclusion

Based on the above mentioned reasoning and authorities, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE